# EXHIBIT A

## BUREAU OF CONSUMER FINANCIAL PROTECTION

**12 CFR Part 1026**

**[Docket No. CFPB–2012–0033]**

**RIN 3170–AA14**

## Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z)

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule; official interpretations.

**SUMMARY:** The Bureau of Consumer Financial Protection is amending Regulation Z, which implements the Truth in Lending Act and the official interpretation to the regulation, which interprets the requirements of Regulation Z. This final rule implements provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act regarding mortgage loan servicing. Specifically, this final rule implements Dodd-Frank Act sections addressing initial rate adjustment notices for adjustable-rate mortgages, periodic statements for residential mortgage loans, prompt crediting of mortgage payments, and responses to requests for payoff amounts. This final rule also amends current rules governing the scope, timing, content, and format of disclosures to consumers regarding the interest rate adjustments of their variable-rate transactions. Concurrently with the issuance of this final rule, the Bureau is amending Regulation X, which contains companion rules implementing amendments to the Real Estate Settlement Procedures Act of 1974.

**DATES:** This final rule is effective on January 10, 2014.

**FOR FURTHER INFORMATION CONTACT:**

*Regulation Z (TILA):* Whitney Patross, Attorney; Marta Tanenhaus or Mitchell E. Hochberg, Senior Counsels, Office of Regulations, at (202) 435–7700.

*Regulation X (RESPA):* Whitney Patross, Attorney; Jane Gao, Terry Randall or Michael Scherzer, Counsels; Lisa Cole or Mitchell E. Hochberg, Senior Counsels, Office of Regulations, at (202) 435–7700.

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Final Rule

The Bureau of Consumer Financial Protection (Bureau) is amending Regulation Z, which implements the Truth in Lending Act (TILA) and the official interpretation to the regulation (the 2013 TILA Servicing Final Rule). The final rule implements provisions of the Dodd-Frank Wall Street Reform and

Consumer Protection Act regarding mortgage loan servicing.[1] Specifically, this final rule implements Dodd-Frank Act sections addressing initial interest rate adjustment notices for adjustable-rate mortgages (ARMs), periodic statements for residential mortgage loans, prompt crediting of mortgage payments, and responses to requests for payoff amounts. This final rule also amends current rules governing the scope, timing, content, and format of disclosures to consumers occasioned by the interest rate adjustments of their variable-rate transactions. Concurrently with the issuance of this final rule, the Bureau is amending Regulation X, which contains companion rules implementing amendments to the Real Estate Settlement Procedures Act of 1974 (the 2013 RESPA Servicing Final Rule).

On August 10, 2012, the Bureau issued proposed rules that would have amended Regulation X, which implements RESPA,[2] as well as Regulation Z, which implements TILA,[3] regarding mortgage servicing requirements.[4] The Proposed Servicing Rules proposed to implement the Dodd-Frank Act amendments to TILA and RESPA with respect to, among other things, periodic mortgage statements, disclosures for ARMs, prompt crediting of mortgage loan payments, requests for mortgage loan payoff statements, error resolution, information requests, and protections relating to force-placed insurance. In the 2012 RESPA Servicing Proposal, the Bureau also proposed to use its authority to adopt requirements relating to servicer policies and procedures, early intervention with delinquent borrowers, continuity of contact, and procedures for evaluating and responding to loss mitigation

applications.[5] The proposals sought to address fundamental problems that underlie many consumer complaints and recent regulatory and enforcement actions, as set forth in more detail below.

The Bureau is finalizing the Proposed Servicing Rules with respect to nine major topics, as summarized below, as well as certain technical and streamlining amendments. The goals of the Final Servicing Rules are to provide better disclosure to consumers of their mortgage loan obligations and to better inform consumers of, and assist consumers with, options that may be available for consumers having difficulty with their mortgage loan obligations. The amendments also address critical servicer practices relating to, among other things, correcting errors, imposing charges for force-placed insurance, crediting mortgage loan payments, and providing payoff statements. The Bureau's final rules are set forth in two separate notices because some provisions implement requirements that Congress imposed under TILA while other provisions implement requirements Congress imposed under RESPA.[6]

### A. Major Topics in the Final Servicing Rules

*1. Periodic billing statements (2013 TILA Servicing Final Rule).* Creditors, assignees, and servicers must provide a periodic statement for each billing cycle containing, among other things, information on payments currently due and previously made, fees imposed, transaction activity, application of past payments, contact information for the servicer and housing counselors, and, where applicable, information regarding delinquencies. These statements must meet the timing, form, and content requirements provided in the rule. The rule contains sample forms that may be used. The periodic statement requirement generally does not apply to fixed-rate loans if the servicer provides a coupon book, so long as the coupon book contains certain information specified in the rule and certain other information specified in the rule is

---

[1] Public Law 111–203, 124 Stat. 1376 (2010).

[2] *See* Press Release, U.S. Consumer Fin. Prot. Bureau, *Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers* (Aug. 10, 2012) available at *http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/*. The proposal was published in the **Federal Register** on September 17, 2012. 77 FR 57200 (Sept. 17 2012) (2012 RESPA Servicing Proposal).

[3] *See* Press Release, U.S. Consumer Fin. Prot. Bureau, *Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers* (August 10, 2012) available at *http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/*. This proposal was also published in the **Federal Register** on September 17, 2012. 77 FR 57318 (Sept. 17, 2012) (2012 TILA Servicing Proposal; and, together with the 2012 RESPA Servicing Proposal, the Proposed Servicing Rules).

[4] The 2013 RESPA Servicing Final Rule and the 2013 TILA Servicing Final Rule are referred to collectively as the Final Servicing Rules.

[5] For ease of discussion, this notice uses the term "discretionary rulemakings" to refer to a set of regulations implemented using the Bureau's authorities under section 6(j), 6(k)(1)(E), or 19(a) of RESPA to expand requirements beyond those explicit in RESPA. The "discretionary rulemakings" include requirements relating to servicer policies and procedures, early intervention with delinquent borrowers, continuity of contact, and procedures for evaluating and responding to loss mitigation applications, as set forth in §§ 1024.38–1024.41.

[6] Note that TILA and RESPA differ in their terminology. Whereas Regulation Z generally refers to "consumers" and "creditors," Regulation X generally refers to "borrowers" and "lenders."

1. *In general.* An adjustable-rate mortgage, as defined in § 1026.20(d)(1)(i), is a variable-rate transaction as that term is used in subpart C, except as distinguished by comment 1 1026.20(d)(1)(ii)–2. The requirements of this section are not limited to transactions financing the initial acquisition of the consumer's principal dwelling.

*Paragraph 20(d)(1)(ii).*

1. *Short-term ARMs.* Under § 1026.20(d)(1)(ii), construction, home improvement, bridge, and other loans with terms of one year or less are not subject to the requirements in § 1026.20(d). In determining the term of a construction loan that may be permanently financed by the same creditor or assignee, the creditor or assignee may treat the construction and the permanent phases as separate transactions with distinct terms to maturity or as a single combined transaction.

2. *Non-adjustable-rate mortgages.* The following transactions, if structured as fixed-rate and not as adjustable-rate mortgages based on an index or formula, are not subject to § 1026.20(d):

i. Shared-equity or shared-appreciation mortgages;

ii. Price-level adjusted or other indexed mortgages that have a fixed rate of interest but provide for periodic adjustments to payments and the loan balance to reflect changes in an index measuring prices or inflation;

iii. Graduated-payment mortgages or step-rate transactions;

iv. Renewable balloon-payment instruments; and

v. Preferred-rate loans.

*Paragraph 20(d)(2)(i).*

1. *Date of the disclosure.* The date that must appear on the disclosure is the date the creditor, assignee, or servicer generates the notice to be provided to the consumer.

*Paragraph 20(d)(2)(iii)(A).*

1. *Current and new interest rates.* The current interest rate is the interest rate that applies on the date of the disclosure. The new interest rate is the interest rate used to calculate the new payment and may be an estimate pursuant to § 1026.20(d)(2). The new payment, if calculated from an estimated new interest rate, will also be an estimate. The ''new interest rate'' has the same meaning as the ''adjusted interest rate.'' The requirements of § 1026.20(d)(2)(iii)(A) do not preclude creditors, assignees, and servicers from rounding the interest rate, pursuant to the requirements of the ARM contract.

*Paragraph 20(d)(2)(v).*

1. *Rate limits and foregone interest rate increases.* Interest rate carryover, or foregone interest rate increases, is the amount of interest rate increase foregone at the first ARM interest rate adjustment that, subject to rate caps, can be added to future interest rate adjustments to increase, or to offset decreases in, the rate determined by using the index or formula. The disclosures required by § 1026.20(d)(2)(v) regarding foregone interest rate increases apply only to transactions permitting interest rate carryover.

*Paragraph 20(d)(2)(vii).*

1. *Amortization statement.* For ARMs requiring the payment of interest only, such

as interest-only loans, § 1026.20(d)(2)(vii) requires a statement that the new payment covers all of the interest but none of the principal, and therefore will not reduce the loan balance. For negatively-amortizing ARMs, § 1026.20(d)(2)(vii) requires a statement that the new payment covers only part of the interest and none of the principal, and therefore the unpaid interest will be added to the principal balance.

2. *Amortization payment.* Disclosure of the payment needed to amortize fully the outstanding balance at the new interest rate over the remainder of the loan term is required only when negative amortization occurs as a result of the interest rate adjustment. The disclosure is not required simply because a loan has interest-only or partially-amortizing payments. For example, an ARM with a five-year term and payments based on a longer amortization schedule, in which the final payment will equal the periodic payment plus the remaining unpaid balance, does not require disclosure of the payment necessary to amortize fully the loan in the remainder of the five-year term. A disclosure is also not required when the new payment is sufficient to prevent negative amortization but the final loan payment will be a different amount due to rounding.

*Paragraph 20(d)(2)(viii).*

1. *Prepayment penalty.* The creditor, assignee, or servicer of an ARM with no prepayment penalty, as that term is used in § 1026.20(d)(2)(viii), may decide to exclude the prepayment section from the § 1026.20(d) disclosure, retain the prepayment section and insert after the heading ''None'' or other indication that there is no prepayment penalty, or indicate there is no prepayment penalty in some other manner. *See also* comment to Appendices G and H—Open-End and Closed-End Model Forms and Clauses—1.vi.

*Paragraph 20(d)(3)(i).*

1. *Format of disclosures.* The requirements of § 1026.20(d)(3)(i) and (iii) to provide the § 1026.20(d) disclosures in the same order as, and with headings and format substantially similar to, the model and sample forms do not preclude creditors, assignees, and servicers from modifying the disclosures to accommodate particular consumer circumstances or transactions not addressed by the forms. For example, in the case of a consumer bankruptcy or under certain State laws, the creditor, assignee, or servicer may modify the forms to remove language regarding personal liability. A payment-option ARM, which is an ARM permitting consumers to choose among several different payment options for each billing period, is an example of a loan that may require modification of the § 1026.20(d) model and sample forms. See appendix H–30(C) for an example of an allocation table for a payment-option loan.

\*       \*       \*       \*       \*

**Subpart E—Special Rules for Certain Home Mortgage Transactions**

\*       \*       \*       \*       \*

Section 1026.36—Prohibited Acts or Practices in Connection With Credit Secured by a Dwelling

\*       \*       \*       \*       \*

*Paragraph 36(c)(1)(i).*

\*       \*       \*       \*       \*

2. *Method of crediting periodic payments.* The method by which periodic payments shall be credited is based on the legal obligation between the creditor and consumer, subject to applicable law.

\*       \*       \*       \*       \*

*Paragraph 36(c)(1)(ii).*

1. *Handling of partial payments.* If a servicer receives a partial payment from a consumer, to the extent not prohibited by applicable law or the legal obligation between the parties, the servicer may take any of the following actions:

i. Credit the partial payment upon receipt.

ii. Return the partial payment to the consumer.

iii. Hold the payment in a suspense or unapplied funds account. If the payment is held in a suspense or unapplied funds account, this fact must be reflected on future periodic statements, in accordance with § 1026.41(d)(3). When sufficient funds accumulate to cover a periodic payment, as defined in § 1026.36(c)(1)(i), they must be treated as a periodic payment received in accordance with § 1026.36(c)(1)(i).

*Paragraph 36(c)(1)(iii).*

1. *Payment requirements.* The servicer may specify reasonable requirements for making payments in writing, such as requiring that payments be accompanied by the account number or payment coupon; setting a cut-off hour for payment to be received, or setting different hours for payment by mail and payments made in person; specifying that only checks or money orders should be sent by mail; specifying that payment is to be made in U.S. dollars; or specifying one particular address for receiving payments, such as a post office box. The servicer may be prohibited, however, from requiring payment solely by preauthorized electronic fund transfer. *See* section 913 of the Electronic Fund Transfer Act, 15 U.S.C. 1693k.

2. *Payment requirements—limitations.* Requirements for making payments must be reasonable; it should not be difficult for most consumers to make conforming payments. For example, it would be reasonable to require a cut-off time of 5 p.m. for receipt of a mailed check at the location specified by the servicer for receipt of such check.

3. *Implied guidelines for payments.* In the absence of specified requirements for making payments, payments may be made at any location where the servicer conducts business; any time during the servicer's normal business hours; and by cash, money order, draft, or other similar instrument in properly negotiable form, or by electronic fund transfer if the servicer and consumer have so agreed.

*Paragraph 36(c)(2).*

1. *Pyramiding of late fees.* The prohibition on pyramiding of late fees in § 1026.36(c)(2) should be construed consistently with the ''credit practices rule'' of the Federal Trade Commission, 16 CFR 444.4.

*Paragraph 36(c)(3).*

1. *Person acting on behalf of the consumer.* For purposes of § 1026.36(c)(3), a person acting on behalf of the consumer may include the consumer's representative, such as an

attorney representing the individual, a non-profit consumer counseling or similar organization, or a creditor with which the consumer is refinancing and which requires the payoff statement to complete the refinancing. A creditor, assignee or servicer may take reasonable measures to verify the identity of any person acting on behalf of the consumer and to obtain the consumer's authorization to release information to any such person before the "reasonable time" period begins to run.

2. *Payment requirements.* The creditor, assignee or servicer may specify reasonable requirements for making payoff requests, such as requiring requests to be directed to a mailing address, email address, or fax number specified by the creditor, assignee or servicer or any other reasonable requirement or method. If the consumer does not follow these requirements, a longer timeframe for responding to the request would be reasonable.

3. *Accuracy of payoff statements.* Payoff statements must be accurate when issued.

\*     \*     \*     \*     \*

Section 1026.41—Periodic Statements for Residential Mortgage Loans

*41(a) In general.*

1. *Recipient of periodic statement.* When two consumers are joint obligors with primary liability on a closed-end consumer credit transaction secured by a dwelling, subject to § 1026.41, the periodic statement may be sent to either one of them. For example, if a husband and wife jointly own a home, the servicer need not send statements to both the husband and the wife; a single statement may be sent.

2. *Billing cycles shorter than a 31-day period.* If a loan has a billing cycle shorter than a period of 31 days (for example, a bi-weekly billing cycle), a periodic statement covering an entire month may be used. Such statement would separately list the upcoming payment due dates and amounts due, as required by § 1026.20(d)(1), and list all transaction activity that occurred during the related time period, as required by paragraph (d)(4). Such statement may aggregate the information for the explanation of amount due, as required by paragraph (d)(2), and past payment breakdown, as required by paragraph (d)(3).

3. *One statement per billing cycle.* The periodic statement requirement in § 1026.41 applies to the "creditor, assignee, or servicer as applicable." The creditor, assignee, and servicer are all subject to this requirement (*but see* comment 41(a)–4), but only one statement must be sent to the consumer each billing cycle. When two or more parties are subject to this requirement, they may decide among themselves which of them will send the statement.

4. *Opting out.* A consumer may not opt out of receiving periodic statements altogether. However, consumers who have demonstrated the ability to access statements online may opt out of receiving notifications that statements are available. Such an ability may be demonstrated, for example, by the consumer receiving notification that the statements is available, going to the Web site where the information is available, viewing the information about their account and selecting a link or option there to indicate they no longer would like to receive notifications when new statements are available.

*41(b) Timing of the periodic statement.*

1. *Reasonably prompt time.* Section 1026.41(b) requires that the periodic statement be delivered or placed in the mail no later than a reasonably prompt time after the payment due date or the end of any courtesy period. Delivering, emailing or placing the periodic statement in the mail within four days of close of the courtesy period of the previous billing cycle generally would be considered reasonably prompt.

2. *Courtesy period.* The meaning of "courtesy period" is explained in comment 7(b)(11)–1.

*41(c) Form of the periodic statement.*

1. *Clear and conspicuous standard.* The "clear and conspicuous" standard generally requires that disclosures be in a reasonably understandable form. Except where otherwise provided, the standard does not prohibit adding to the required disclosures, as long as the additional information does not overwhelm or obscure the required disclosures. For example, while certain information about the escrow account (such as the account balance) is not required on the periodic statement, this information may be included.

2. *Additional information; disclosures required by other laws.* Nothing in § 1026.41 prohibits a servicer from including additional information or combining disclosures required by other laws with the disclosures required by this subpart, unless such prohibition is expressly set forth in this subpart, or other applicable law.

3. *Electronic distribution.* The periodic statement may be provided electronically if the consumer agrees. The consumer must give affirmative consent to receive statements electronically. If statements are provided electronically, the creditor, assignee, or servicer may send a notification that a consumer's statement is available, with a link to where the statement can be accessed, in place of the statement itself.

4. *Presumed consent.* Any consumer who is currently receiving disclosures for any account (for example, a mortgage or checking account) electronically from their servicer shall be deemed to have consented to receiving e-statements in place of paper statements.

*41(d) Content and layout of the periodic statement.*

1. *Close proximity.* Paragraph (d) requires several disclosures to be provided in close proximity to one another. To meet this requirement, the items to be provided in close proximity must be grouped together, and set off from the other groupings of items. This could be accomplished in a variety of ways, for example, by presenting the information in boxes, or by arranging the items on the document and including spacing between the groupings. Items in close proximity may not have any intervening text between them.

2. *Not applicable.* If an item required by paragraph (d) or (e) of this section is not applicable to the loan, it may be omitted from the periodic statement or coupon book. For example, if there is no prepayment penalty associated with a loan, the prepayment penalty disclosures need not be provided on the periodic statement.

3. *Terminology.* A servicer may use terminology other than that found on the sample periodic statement in appendix H–30, so long as the new terminology is commonly understood. For example, servicers may take into consideration regional differences in terminology and refer to the account for the collection of taxes and insurance, referred to in § 1026.41(d) as the "escrow account," as an "impound account."

*41(d)(3) Past payment breakdown.*

1. *Partial payments.* The disclosure of any partial payments received since the previous statement that were sent to a suspense or unapplied funds account as required by § 1026.41(d)(3)(i) should reflect any funds that were received in the time period covered by the current statement and that were placed in such account. The disclosure of any portion of payments since the beginning of the calendar year that was sent to a partial payment or suspense account as required by § 1026.41(d)(3)(ii) should reflect all funds that are currently held in a suspense or unapplied funds account. For example:

i. Suppose a payment of $1,000 is due, but the consumer sends in only $600 on January 1, which is held in a suspense account. Further assume there are no fees charged on this account. Assuming there are no other funds in the suspense account, the January statement should reflect: Unapplied funds since last statement—$600. Unapplied funds YTD—$600.

ii. Assume the same facts as in the preceding paragraph, except that during February the consumer sends in $300 and this too is held in the suspense account. The statement should reflect: Unapplied funds since last statement—$300. Unapplied funds YTD—$900.

iii. Assume the same facts as in the preceding paragraph, except that during March the consumer sends in $400. Of this payment, $100 completes a full periodic payment when added to the $900 in funds already held in the suspense account. This $1,000 is applied to the January payment, and the remaining $300 remains in the suspense account. The statement should reflect: Unapplied funds since last statement—$300. Unapplied Funds YTD—$300.

*41(d)(4) Transaction Activity.*

1. *Meaning.* Transaction activity includes any transaction that credits or debits the amount currently due. This is the same amount that is required to be disclosure under § 1026.41(d)(1)(iii). Examples of such transactions include, without limitation:

i. Payments received and applied;
ii. Payments received and held in a suspense account;
iii. The imposition of any fees (for example late fees); and
iv. The imposition of any charges (for example, private mortgage insurance).

2. *Description of late fees.* The description of any late fee charges includes the date of the late fee, the amount of the late fee, and the fact that a late fee was imposed.

EXHIBIT B

**FEDERAL RESERVE SYSTEM**

**12 CFR Part 226**

[Regulation Z; Docket No. R–1305]

**Truth in Lending**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Final rule; official staff commentary.

**SUMMARY:** The Board is publishing final rules amending Regulation Z, which implements the Truth in Lending Act and Home Ownership and Equity Protection Act. The goals of the amendments are to protect consumers in the mortgage market from unfair, abusive, or deceptive lending and servicing practices while preserving responsible lending and sustainable homeownership; ensure that advertisements for mortgage loans provide accurate and balanced information and do not contain misleading or deceptive representations; and provide consumers transaction-specific disclosures early enough to use while shopping for a mortgage. The final rule applies four protections to a newly-defined category of higher-priced mortgage loans secured by a consumer's principal dwelling, including a prohibition on lending based on the collateral without regard to consumers' ability to repay their obligations from income, or from other sources besides the collateral. The revisions apply two new protections to mortgage loans secured by a consumer's principal dwelling regardless of loan price, including a prohibition on abusive servicing practices. The Board is also finalizing rules requiring that advertisements provide accurate and balanced information, in a clear and conspicuous manner, about rates, monthly payments, and other loan features. The advertising rules ban several deceptive or misleading advertising practices, including representations that a rate or payment is "fixed" when it can change. Finally, the revisions require creditors to provide consumers with transaction-specific mortgage loan disclosures within three business days after application and before they pay any fee except a reasonable fee for reviewing credit history.

**DATES:** This final rule is effective on October 1, 2009, except for § 226.35(b)(3), which is effective on April 1, 2010. See part XIII, below, regarding mandatory compliance with § 226.35(b)(3) on mortgages secured by manufactured housing.

**FOR FURTHER INFORMATION CONTACT:** Kathleen C. Ryan or Dan S. Sokolov, Counsels; Paul Mondor, Senior Attorney; Jamie Z. Goodson, Brent Lattin, Jelena McWilliams, Dana E. Miller, or Nikita M. Pastor, Attorneys; Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, DC 20551, at (202) 452–2412 or (202) 452–3667. For users of Telecommunications Device for the Deaf (TDD) only, contact (202) 263–4869.

**SUPPLEMENTARY INFORMATION:**
I. Summary of Final Rules
  A. Rules To Prevent Unfairness, Deception, and Abuse
  B. Revisions To Improve Mortgage Advertising
  C. Requirement To Give Consumers Disclosures Early
II. Consumer Protection Concerns in the Subprime Market
  A. Recent Problems in the Mortgage Market
  B. Market Imperfections That Can Facilitate Abusive and Unaffordable Loans
III. The Board's HOEPA Hearings
  A. Home Ownership and Equity Protection Act (HOEPA)
  B. Summary of 2006 Hearings
  C. Summary of June 2007 Hearing
  D. Congressional Hearings
IV. Interagency Supervisory Guidance
V. Legal Authority
  A. The Board's Authority Under TILA Section 129(l)(2)
  B. The Board's Authority Under TILA Section 105(a)
VI. The Board's Proposal
  A. Proposals To Prevent Unfairness, Deception, and Abuse
  B. Proposals To Improve Mortgage Advertising
  C. Proposal To Give Consumers Disclosures Early
VII. Overview of Comments Received
VIII. Definition of "Higher-Priced Mortgage Loan"—§ 226.35(a)
  A. Overview
  B. Public Comment on the Proposal
  C. General Approach
  D. Index for Higher-Priced Mortgage Loans
  E. Threshold for Higher-Priced Mortgage Loans
  F. The Timing of Setting the Threshold
  G. Proposal To Conform Regulation C (HMDA)
  H. Types of Loans Covered Under § 226.35
IX. Final Rules for Higher-Priced Mortgage Loans and HOEPA Loans
  A. Overview
  B. Disregard of Consumer's Ability To Repay—§§ 226.34(a)(4) and 226.35(b)(1)
  C. Prepayment Penalties—§ 226.32(d)(6) and (7); § 226.35(b)(2)
  D. Escrows for Taxes and Insurance—§ 226.35(b)(3)
  E. Evasion Through Spurious Open-End Credit—§ 226.35(b)(4)
X. Final Rules for Mortgage Loans—§ 226.36
  A. Creditor Payments to Mortgage Brokers—§ 226.36(a)
  B. Coercion of Appraisers—§ 226.36(b)
  C. Servicing Abuses—§ 226.36(c)
  D. Coverage—§ 226.36(d)
XI. Advertising
  A. Advertising Rules for Open-End Home-Equity Plans—§ 226.16
  B. Advertising Rules for Closed-End Credit)—§ 226.24
XII. Mortgage Loan Disclosures
  A. Early Mortgage Loan Disclosures—§ 226.19
  B. Plans To Improve Disclosure
XIII. Mandatory Compliance Dates
XIV. Paperwork Reduction Act
XV. Regulatory Flexibility Analysis

**I. Summary of Final Rules**

On January 9, 2008, the Board published proposed rules that would amend Regulation Z, which implements the Truth in Lending Act (TILA) and the Home Ownership and Equity Protection Act (HOEPA), 73 FR 1672. The Board is publishing final amendments to Regulation Z to establish new regulatory protections for consumers in the residential mortgage market. The goals of the amendments are to protect consumers in the mortgage market from unfair, abusive, or deceptive lending and servicing practices while preserving responsible lending and sustainable homeownership; ensure that advertisements for mortgage loans provide accurate and balanced information and do not contain misleading or deceptive representations; and provide consumers transaction-specific disclosures early enough to use while shopping for mortgage loans.

*A. Rules To Prevent Unfairness, Deception, and Abuse*

The Board is publishing seven new restrictions or requirements for mortgage lending and servicing intended to protect consumers against unfairness, deception, and abuse while preserving responsible lending and sustainable homeownership. The restrictions are adopted under TILA Section 129(l)(2), which authorizes the Board to prohibit unfair or deceptive practices in connection with mortgage loans, as well as to prohibit abusive practices or practices not in the interest of the borrower in connection with refinancings. 15 U.S.C. 1639(l)(2). Some of the restrictions apply only to higher-priced mortgage loans, while others apply to all mortgage loans secured by a consumer's principal dwelling.

Protections Covering Higher-Priced Mortgage Loans

The Board is finalizing four protections for consumers receiving higher-priced mortgage loans. These loans are defined as consumer-purpose, closed-end loans secured by a consumer's principal dwelling and

require consumers to engage in time-consuming credit report correction efforts.

In addition, a servicer's failure to provide accurate payoff statements in a timely fashion can cause substantial injury to consumers. One state attorney general commented that its office often receives complaints about unreasonable delays in the provision of payoff statements. Consumers may want to refinance a loan to obtain a lower interest rate or to avoid default or foreclosure, but may be impeded from doing so due to inaccurate or untimely payoff statements. These consumers thus incur additional costs and may be subject to financial problems or even foreclosure. In addition to the injuries caused by delayed payoff statements, consumers are injured by inaccurate payoff statements. As described above, some servicers assess inaccurate or false fees on the payoff statement without the consumer's knowledge. Even when the consumer requests clarification, a servicer may provide an invalid accounting of fees or charges.[117] Or, a servicer may provide the payoff statement too late in the refinancing process for the consumer to obtain clarification without risking losing his or her new loan commitment.[118]

*Injury not reasonably avoidable.* The injuries caused by servicer abuses are not reasonably avoidable because market competition is not adequate to prevent abusive practices, particularly when mortgages are securitized and servicing rights are sold. Historically, under the mortgage loan process, a lender would often act as both originator and collector—that is, it would service its own loans. Although some creditors sold servicing rights, they remained vested in the customer service experience in part due to reputation concerns and in part because payment streams continued to flow directly to them. However, with rise of the "originate to distribute" model discussed in part II.B above, the original creditor has become removed from future direct involvement in a consumer's loan, and thus has less incentive and ability to detect or deter servicing abuses or respond to consumer complaints about servicing abuses. When loans are securitized, servicers

contract directly with investors to service the loan, and consumers are not a party to the servicing contract.

Today, separate servicing companies play a key role: they are chiefly responsible for account maintenance, including collecting payments, remitting amounts due to investors, handling interest rate adjustments on variable rate loans, and managing delinquencies and foreclosures. Servicers also act as the primary point of contact for consumers after origination, because in most cases the original creditor has securitized and sold the loan shortly after origination. In exchange for performing these services, servicers generally receive a fixed per-loan or monthly fee, float income, and ancillary fees—including default charges—that consumers must pay.

Investors are principally concerned with maximizing returns on the mortgage loans and are generally indifferent to the fees the servicer charges the consumer so long as the fees do not reduce the investor's return (e.g., by prompting an unwarranted foreclosure). Consumers are not able to choose their servicers. Consumers also are not able to change servicers without refinancing, which is a time-consuming, expensive undertaking. Moreover, if interest rates are rising, refinancing may only be possible if the consumer accepts a loan with a higher interest rate. After refinancing, consumers may find their loans assigned back to the same servicer as before, or to another servicer engaging in the same practices. As a result, servicers do not have to compete in any direct sense for consumers. Thus, there may not be sufficient market pressure on servicers to ensure competitive practices.[119]

*Injury not outweighed by countervailing benefits to consumers or to competition.* The injuries described above also are not outweighed by any countervailing benefits to consumers or competition. Commenters did not cite, and the Board is not aware of, any benefit to consumers from delayed crediting of payments, pyramided fees, or delayed issuance of payoff statements.

For these reasons, the Board finds the acts and practices prohibited under § 226.36(c) for closed-end consumer credit transactions secured by a

consumer's principal dwelling to be unfair. As described in part V.A above, TILA Section 129(l)(2) authorizes protections against unfair practices "in connection with mortgage loans" that the Board finds to be unfair or deceptive. 15 U.S.C. 1639(l)(2). Therefore, the Board may take action against unfair or deceptive practices by non-creditors and against unfair or deceptive practices outside of the origination process, when such practices are "in connection with mortgage loans." The Board believes that unfair or deceptive servicing practices fall squarely within the purview of Section 129(l)(2) because servicing is an integral part of the life of a mortgage loan and as such is "in connection with mortgage loans." Accordingly, the final rule prohibits certain unfair or deceptive servicing practices under Section 129(l)(2), 15 U.S.C. 1639(l)(2).

### The Final Rule

Section 226.36(c) prohibits three servicing practices. First, the rule prohibits a servicer from failing to credit a payment to a consumer's account as of the date received. Second, the rule prohibits "pyramiding" of late fees by prohibiting a servicer from imposing a late fee on a consumer for making a payment that constitutes the full amount due and is timely, but for a previously assessed late fee. Third, the rule prohibits a servicer from failing to provide, within a reasonable time after receiving a request, an accurate statement of the amount currently required to pay the obligation in full, often referred to as a payoff statement. Under § 226.36(c)(3), the term "servicer" and "servicing" are given the same meanings as provided in Regulation X, 24 CFR 3500.2. As described in more detail below, the Board is not adopting the proposed rule that would prohibit a servicer from failing to provide to a consumer, within a reasonable time after receiving a request, a schedule of all fees and charges it imposes in connection with mortgage loans it services.

The Board recognizes that servicers will incur additional costs to alter their systems to comply with some aspects of the final rule. For example, in some instances some servicers may incur costs in investing in systems to produce payoff statements within a shorter period of time than their current technology affords. As a result, some servicers will, directly or indirectly, pass those costs on to consumers. The Board believes, however, that these costs to consumers are outweighed by

[117] *See, e.g., In re Maxwell,* 281 B.R. 101, 114 (D. Mass 2002).

[118] *See, e.g., In re Jones,* 366 B.R. at 587–588 (consumer in bankruptcy forced to remit improper sums demanded on payoff statement or lose loan commitment from new lender: "Although Debtor questioned the amounts [servicer] alleged were due, he was unable to obtain an accounting from [servicer] explaining its calculations or any other substantiation for the payoff.").

[119] In one survey, J.D. Power found that consumers whose loans have been sold have customer satisfaction scores 22 points lower than those who have remained with the loan originator. J.D. Power and Associates Reports: USAA Ranks Highest in Customer Satisfaction with Primary Mortgage Servicing, Press Release (July 19, 2006), available at *http://www.jdpower.com/corporate/news/releases/pdf/3006117.pdf.*